FILED
2015 Feb-10  AM 08:13
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **BRENDA LISA FORD,** | ) | |
| | ) | |
| **Claimant,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 5:14-cv-1115-CLS** |
| | ) | |
| **CAROLYN W. COLVIN, Acting** | ) | |
| **Commissioner, Social Security** | ) | |
| **Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### MEMORANDUM OPINION AND ORDER

Claimant, Brenda Lisa Ford, commenced this action on June 12, 2014, pursuant to 42 U.S.C. § 405(g), seeking judicial review of a final adverse decision of the Commissioner, affirming the decision of the Administrative Law Judge ("ALJ"), and thereby denying her claim for a period of disability, disability insurance, and supplemental security income benefits. For the reasons stated herein, the court finds that the Commissioner's ruling is due to be affirmed.

The court's role in reviewing claims brought under the Social Security Act is a narrow one. The scope of review is limited to determining whether there is substantial evidence in the record as a whole to support the findings of the Commissioner, and whether correct legal standards were applied. *See Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Tieniber v. Heckler*, 720 F.2d 1251, 1253

(11th Cir. 1983).

Claimant contends that the Commissioner's decision is neither supported by substantial evidence nor in accordance with applicable legal standards. Specifically, claimant contends that: (1) she should have been found to be disabled under Listing 12.05C, addressing intellectual disability; (2) the Appeals Council should have considered new and additional evidence that established her disability; (3) the ALJ improperly considered the opinion of her treating physician; (4) the ALJ improperly considered her subjective complaints of pain; (5) she should have been found disabled under Medical-Vocational Rule 201.18; and (6) the Commissioner should have "reopened" a previous administrative decision from October 4, 2010.[1]

## 1.    Listing 12.05C

Claimant asserts that she should have been found disabled pursuant to Listing 12.05C, addressing intellectual disability, which states as follows:

> *Intellectual disability.* Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.,* the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

---

[1] Plaintiff is proceeding *pro se*. The brief she submitted pursuant to the court's briefing schedule consisted of only a single page. *See* doc. no. 12. But claimant also submitted several pages of argument along with her complaint, so the court will also consider those arguments as part of claimant's case. *See* attachments to doc. no. 1 (Complaint)

. . . .

      C.    A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. . . .

20 C.F.R. pt. 404, subpt. P, appx. 1, § 12.05 (listings) (italics in original, ellipses supplied).[2]

The ALJ found that the "C" criteria of this listing had not been satisfied because "claimant does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function."[3]  That statement, standing alone, is not supported by the record.  The ALJ acknowledged that claimant received a full-scale IQ score of 68 when she was in school,[4] and it cannot be denied that claimant

---

    [2]    Effective September 3, 2013, the Social Security Administration replaced the term mental retardation with the term intellectual disability as a listed impairment. Change in Terminology: "Mental Retardation" to "Intellectual Disability," 78 Fed. Reg. 46,499, 46,4501 (Aug. 1, 2013) (to be codified at 20 C.F.R. pt. 404, subpt. P, app. 1).  This change was made because "the term 'mental retardation' has negative connotations," and "has become offensive to many people." *Id.* at 46,499. But this change "d[id] not affect the actual medical definition of the disorder or available programs or services." *Id.* at 49,500.

*Frame v. Commissioner, Social Security Administration*, – F. App'x –, 2015 WL 150733, *2 n.2 (11th Cir. Jan. 13, 2015) (alteration in original).  Thus, even though the ALJ's decision was "issued before the change took effect," this court, like the Eleventh Circuit panel in *Frame,* will "follow the agency's new nomenclature." *Id.* at *2 n.2.

    [3] Tr. 24.

    [4] Tr. 25.

has physical impairments that impose significant work-related limitations of function. Indeed, the ALJ found that claimant had the severe impairments of arthritis, obesity, pain syndrome, and depression, in addition to her borderline intellectual functioning.[5] The ALJ's residual functional capacity finding also included significant limitations, including lifting restrictions and postural and environmental limitations.[6]

The ALJ also found that the prefatory criteria for Listing 12.05 had not been satisfied.  The first aspect of that finding — that claimant had failed to allege onset of mental limitations prior to age 22 — also is not supported by the record. Claimant's full-scale IQ score of 68 dates back to her school days, when she obviously was less than 22 years old.

The second aspect of the ALJ's finding about the prefatory criteria is correct, however.  The ALJ found that claimant had "engaged in education and work activities inconsistent with limitations in adaptive functioning that would show [intellectual disability.]"[7] That finding is consistent with Eleventh Circuit precedent, which was

---

[5] Tr. 23.

[6] Tr. 26 ("[T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b).  She can occasionally lift and/or carry 20 pounds, and frequently lift and/or carry ten pounds.  She can sit, stand or walk for up to six hours each in an eight-hour workday.  She can occasionally climb ramps and stairs but no ladders, ropes or scaffolds. She cannot work around dangerous machinery or unprotected heights.  She is limited to work involving simple instructions and no detailed instructions.  Changes in the work setting should be gradually introduced.  She cannot work in extreme cold and heat or around vibrations.  She can occasionally stoop, crouch, kneel and crawl.") (alteration supplied).

[7] *Id.* (alteration supplied).

summarized in a recent, unreported Circuit opinion:  *Hickel v. Commissioner of Social Security*, 539 F. App'x 980 (11th Cir. 2013).   The binding precedent summarized in that opinion provides

> that a valid IQ score of 60 to 70 after age 22 "create[s] a rebuttable presumption of a fairly constant IQ throughout [a claimant's] life." *Hodges*[ *v. Barnhart*], 276 F.3d [1265,] 1268 [(11th Cir. 2001)] (explaining that, absent evidence of sudden trauma that could cause retardation, a claimant who presents a valid IQ score need not also present evidence that her mental impairment arose before age 22). However, "a valid I.Q. score need not be conclusive of mental retardation where the I.Q. score is inconsistent with other evidence in the record on the claimant's daily activities and behavior." *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992); *see also Popp v. Heckler*, 779 F.2d 1497, 1499-1500 (11th Cir.1986) (stating that the ALJ may disregard IQ test results that are inconsistent with other record evidence because the regulations require the ALJ to examine intelligence tests and other evidence, such as the medical report and the claimant's daily activities and behavior).

*Hickel*, 539 F. App'x at 983-84 (alterations in original) (footnote omitted).[8]

The ALJ's finding also was supported by substantial evidence.  The ALJ relied primarily on the following facts:

> The claimant testified that she cared for minor children and her

---

[8] The omitted footnoted stated:

> The regulations provide that "standardized intelligence tests may provide data to help verify the presence of mental retardation," but the results of such tests "are only part of the overall assessment" and "the narrative report that accompanies the test results should comment on whether the IQ scores are considered valid and consistent with the developmental history and the degree of functional limitation." 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(D)(6)(a).

*Hickel*, 539 F. App'x at 984.

disabled son.  She has a joint checking account with her daughter; she has a debit card and gets food stamps, and is able to manage them although her daughter does most of it.  She takes the children to the park and is able to look after their safety and take appropriate precautions.[9]

The ALJ also noted that claimant was "capable of independent living," that she completed the 11th grade, and that she received some special education training but was not formally enrolled in the special education curriculum.  He noted that both claimant's treating psychiatrist and the examining psychologist "found good levels of functional abilities including understanding, remembering and following work instructions and maintaining concentration, persistence and pace."[10]   Claimant routinely shopped for personal items, household items, and groceries, and she had "worked at a semiskilled job that required her to plan and execute work, and to maintain a spectrum of duties."[11]   All of those findings represent permissible considerations in evaluating claimant's adaptive functioning, and all are supported by the record.  *See Garrett v. Astrue*, 244 F. App'x 937, 939 (11th Cir. 2007) (holding that the claimant's ability to cook simple meals, perform household chores, build model cars, attend church, watch television, play cards, and walk in the mall were inconsistent with a finding of significant impairment of adaptive functioning); *Outlaw v. Barnhart,* 197 F. App'x 825, 827 (11th Cir. 2006) (stating that the claimant's "long

---

[9] Tr. 25.

[10] *Id.*

[11] *Id.*

work history in semi-skilled positions and daily activities were inconsistent with his

adult IQ scores," which were below 70); *Humphries v. Barnhart*, 183 F. App'x 887,

889 (11th Cir. 2006) (holding that substantial evidence supported the ALJ's finding

that the claimant did not have deficits in adaptive functioning when she worked in a

school cafeteria for 21 years and served as the manager for about 15 years).

In summary, even though the court does not agree with the ALJ's conclusions

at each step in the process of analyzing whether claimant satisfied the requirements

of Listing 12.05C, the court must conclude that the ALJ's ultimate decision — that

claimant lacked the deficits in adaptive functioning necessary to demonstrate

disability under Listing 12.05C — was in accordance with applicable law and

supported by substantial evidence.

## 2.    New Evidence

Claimant next asserts that the Appeals Council erred in considering the

Behavioral Health Evaluation conducted by Dr. Theron M. Colvin, a consultative

psychologist, on May 4, 2013.  During Dr. Colvin's examination, claimant was fully

oriented as to time, place, person, and situation.  She was unable to subtract serial 7's

from 100, or to perform simple arithmetic.  She could make comparisons between

paired objects, but she could not interpret simple proverbs.  Her general fund of

information was mixed.  Her memory tested poorly, and she also reported a great deal

of forgetfulness in her everyday life.  She did not exhibit looseness of associations or mental confusion.  She reported impaired sleep, anxiety and irritability during the day, and past suicidal ideation.[12]

A personality assessment test revealed "severe to very severe emotional distress characterized by apathy, fearfulness, hopelessness, dysphoria, and anhedonia."[13] Claimant also displayed "marked concentration and attention difficulties, memory deficits, and poor judgment."[14]  Dr. Colvin believed that many of claimant's reported symptoms "reflect a psychotic process or a very long-term, characterologic condition."[15]  Claimant was revealed to be "introverted and uncomfortable around others," with unpredictable and often inappropriate behavior.[16]  Dr. Colvin thought claimant was "likely to have suicidal ideation, and her sense of futility and hopelessness increases the probability of suicidal behavior."[17]  She also was likely to "use substances."[18]  Intelligence testing revealed a Verbal IQ of 68, a Performance IQ of 68, and a Full-Scale IQ of 65, placing claimant within the range of mild mental retardation.[19]

---

[12] Tr. 8-10.  ***Nota bene:*** Pages 8 and 9 of the administrative record were filed in reverse order.

[13] Tr. 10.

[14] *Id.*

[15] *Id.*

[16] *Id.*

[17] Tr. 11.

[18] *Id.*

[19] *Id.*

Dr. Colvin assessed claimant as experiencing schizoaffective disorder, depressive type; paranoid personality disorder; schizotypal personality disorder, borderline personality disorder; and, mild mental retardation.  He assigned a GAF score of 45, indicating serious symptoms.[20]  Claimant's prognosis was "very poor." She needed medication, but any medication use would have to be closely monitored due to the potential for suicide.  Dr. Colvin expected claimant's condition to last at least another 12 months, and he opined that, at the present time, claimant "cannot obtain and maintain gainful employment."[21]  He suggested referral to the local community mental health center.[22]

The Appeals Council stated in its April 17, 2014 order that it "looked at" Dr. Colvin's report, but it concluded that the report did not change the outcome of claimant's case because it related to a time period *after* the ALJ's December 7, 2012 decision.[23]  Claimant was advised that if she wanted the Commissioner to consider whether she was disabled *after* December 7, 2012, she would need to file a new application.  The Appeals Council's decision was consistent with Eleventh Circuit authority providing that:

When a claimant submits new evidence to the AC [*i.e.,* Appeals

---

[20] Tr. 13.

[21] *Id.*

[22] *Id.*

[23] Tr. 2.

> Council], the district court must consider the entire record, including the evidence submitted to the AC, to determine whether the denial of benefits was erroneous. *Ingram*[ *v. Commissioner of Social Security Administration*], 496 F.3d [1253,] 1262 [(11th Cir. 2007)]. Remand is appropriate when a district court fails to consider the record as a whole, including evidence submitted for the first time to the AC, in determining whether the Commissioner's final decision is supported by substantial evidence. *Id.* at 1266-67. *The new evidence must relate back to the time period on or before the date of the ALJ's decision.* 20 C.F.R. § 404.970(b).

*Smith v. Astrue,* 272 F. App'x 789, 802 (11th Cir. 2008) (alterations and emphasis supplied).

Dr. Colvin's report was dated May 4, 2013, and it was an assessment of claimant's condition on that date. There is no reason to believe that Dr. Colvin's report related back to the time period *before* the ALJ's December 7, 2012 decision. Accordingly, the Appeals Council was justified in refusing to consider the report.

## 3. Treating Physician Opinion

Claimant next asserts that the ALJ improperly considered the opinion of Dr. Pragya Katoch, her treating physician.

The opinion of a treating physician "must be given substantial or considerable weight unless 'good cause' is shown to the contrary." *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004) (internal citations omitted). Good cause exists when "(1) [the] treating physician's opinion was not bolstered by the evidence; (2) [the] evidence supported a contrary finding; or (3) [the] treating physician's opinion was

conclusory or inconsistent with the doctor's own medical records." *Id*. (alterations supplied). Additionally, the ALJ is not required to accept a conclusory statement from a medical source, even a treating source, that a claimant is unable to work, because the decision whether a claimant is disabled is not a medical opinion, but is a decision "reserved to the Commissioner." 20 C.F.R. §§ 404.1527(d), 416.927(d).

Social Security regulations also provide that, in considering what weight to give *any* medical opinion (regardless of whether it is from a treating or non-treating physician), the Commissioner should evaluate: the extent of the examining or treating relationship between the doctor and patient; whether the doctor's opinion can be supported by medical signs and laboratory findings; whether the opinion is consistent with the record as a whole; the doctor's specialization; and other factors. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c). *See also Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986) ("The weight afforded a physician's conclusory statements depends upon the extent to which they are supported by clinical or laboratory findings and are consistent with other evidence as to claimant's impairments.").

Dr. Katoch ordered a Functional Capacity Evaluation to be conducted by a physical therapist on August 18, 2011. Claimant reported constant pain at a level 10. As a result, during a 24-hour period, she sleeps or lies down for 12 hours, stands or

walks for 3 hours, and sits for the remaining 9 hours.  During a motor assessment conducted by the physical therapist, claimant's gait was slightly altered, and she had tenderness to palpitation down her entire spine.  She also experienced pain in both shoulders, both upper extremities, both hips, and both legs.  Her shoulder, elbow, wrist, knee, and ankle strength all were 4/5 bilaterally.  Her hip strength was 3/5, and her trunk strength was 2/5.  Her upper and lower extremity reflexes were symmetrical. She could only perform a half-squat, but that was reduced to a quarter-squat with repetition.  She had reduced range of motion in her cervical spine and trunk, and her straight leg raise tests were positive.  Her shoulder, elbow, and wrist range of motion were within functional limits.  Her grip strength was significantly decreased in both hands.  She could lift 20 pounds from the floor to her waist, and 10 pounds from her waist to overhead.  Pain limited her ability to demonstrate the horizontal lift.  She could carry a maximum of 10 pounds with her right hand and 20 pounds with her left hand, but pain limited her ability to demonstrate a two-handed carry.  Her gait was slow, and she had poor balance.  The physical therapist recommended four weeks of outpatient therapy to increase strength, endurance, flexibility and function.[24]

The ALJ concluded that the Functional Capacity Evaluation "should be considered valid and the best estimate of physical capacities" based upon the

---

[24] Tr. 461-68.

evaluation results and the physical therapist's observations during testing.[25]  He also concluded that, "[a]s testing directed by Dr. Katoch, the [Functional Capacity Evaluation] results should be accorded significant weight in assessing the claimant's maximum residual functional capacity."[26]

Dr. Katoch subsequently completed a form entitled "Medical Assessment Of Ability To Do Work-Related Activities (Physical)" on July 31, 2012.   That assessment reflected much more serious limitations than the physical therapist's Functional Capacity Evaluation.  Dr. Katoch opined that claimant could lift only 5 pounds occasionally due to carpal tunnel syndrome, fibromyalgia, and a herniated disc in her lower back.  She could stand and walk for only 20 minutes at a time, and for a total of only 1.5 hours during an 8-hour workday.  She could sit for only 20 minutes at a time, and for a total of only 2 hours during an 8-hour workday.  Her sitting, standing, and walking limitations were due to her herniated disc and fibromyalgia.  She could only occasionally climb, stoop, kneel, balance, crouch, and crawl.  Her ability to reach, handle, feel, push, and pull would be affected, but Dr. Katoch did not specify to what degree.  However, her ability to see, hear, and speak would not be affected.  Dr. Katoch did not impose any environmental restrictions, but he did state that claimant would be unable to focus on work due to her constant

---

[25] Tr. 31.

[26] *Id.* (alterations supplied).

pain.[27]

The ALJ afforded Dr. Katoch's "Medical Assessment Of Ability To Do Work-Related Activities (Physical)" form less weight than the Functional Capacity Evaluation because it was not supported by Dr. Katoch's office notes or any other evidence in the record.  The ALJ noted that "there is no reference by Dr. Katoch in his medical records supporting this ["Medical Assessment Of Ability To Do Work-Related Activities (Physical)"] nor is this form part of his medical records."[28]  The ALJ also noted the lack of any evidence to indicate "significant worsening of the claimant's physical condition from the initial physical capacity formulation."[29]

Finally, Dr. Katoch completed a "Clinical Assessment of Pain" form on July 31, 2013.  He indicated that pain was present to such an extent as to be distracting to adequate performance of daily activities or work, that physical activity would greatly increase claimant's pain to such a degree as to cause distraction from or total abandonment of tasks, that claimant's pain and/or medication would leave her totally restricted and unable to function at a productive level of work, and that claimant's treatments had had no appreciable effect on her pain.[30]

The ALJ afforded "little or no weight" to the Clinical Assessment of Pain form,

---

[27] Tr. 432, 439.

[28] *Id.* (alteration supplied).

[29] *Id.*

[30] Tr. 433, 451, 459.

reasoning:

> The opinion regarding medication side effects is inconsistent with the claimant's denial of side effects to Dr. Alapati. This form regarding pain is also inconsistent with the medical evidence, including [Dr. Katoch's] own, and is based upon the subjective statements of the claimant. As noted, the claimant's statements as to the severity of her condition are unsupported in the record.[31]

The court concludes that the ALJ articulated sufficient reasons for rejecting Dr. Katoch's opinions and, instead, crediting the Functional Capacity Evaluation performed by the physical therapist. Physical therapists are not "acceptable medical sources" under the Social Security regulations, and thus, their opinions are not entitled to the automatic deference due to those of treating physicians. Therapists are, however, considered "other medical sources," and their opinions can be considered, along with others, in evaluating the severity of an impairment and how it affects a claimant's ability to work. *See* 20 C.F.R. §§ 404.1513(a), 404.1513(d)(1), 416.913(a), 416.913(d)(1). Thus, while the ALJ was not *required* to give controlling weight to the physical therapist's assessment, he was entitled to rely upon that assessment in determining the extent of claimant's functional limitations, because he concluded that the assessment was the most reliable source of that information, and it was the most consistent with the rest of the medical evidence. Moreover, substantial evidence of record supports the ALJ's decision. Accordingly, the ALJ did

---

[31] Tr. 32 (alteration supplied).

not err in considering Dr. Katoch's opinions.

## 4.     Pain

Claimant next asserts that the ALJ improperly considered her subjective complaints of pain.

To demonstrate that pain or another subjective symptom renders her disabled, a claimant must "produce 'evidence of an underlying medical condition and (1) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (2) that the objectively determined medical condition is of such severity that it can be reasonably expected to give rise to the alleged pain.'" *Edwards v. Sullivan*, 937 F.2d 580, 584 (11th Cir. 1991) (quoting *Landry v. Heckler*, 782 F.2d 1551, 1553 (11th Cir. 1986)).  If an ALJ discredits subjective testimony of pain, "he must articulate explicit and adequate reasons."  *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987) (citing *Jones v. Bowen*, 810 F.2d 1001, 1004 (11th Cir. 1986; *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986)).

Here, the ALJ found that claimant experienced underlying medical conditions, including arthritis, obesity, pain syndrome, and fibromyalgia.  Even so, there was "no objective clinical evidence of a condition, which could reasonably be expected to produce the level of pain, depression, and other symptoms which the claimant alleges have precluded her from working."[32]  The objective evidence did not confirm either

---

[32] Tr. 27.

the severity of claimant's alleged symptoms arising from her medically documented conditions, or that those conditions could reasonably be expected to give rise to the symptoms she alleged.[33]  The ALJ also found that "claimant's statements concerning the intensity, persistence and limiting effects of [her] symptoms are not credible to the extent they are inconsistent with" the ALJ's finding of a residual functional capacity to perform a limited range of light work.[34]  He noted that claimant had made inconsistent statements about her educational background,[35] that claimant had inconsistently stated that she was able to work in her application for unemployment benefits,[36] and that claimant's allegations of pain were not supported by the medical record.

The ALJ properly applied the Eleventh Circuit's "pain standard," and his conclusions were supported by substantial evidence of record.  Moreover, it was proper, as discussed above, for the ALJ to reject the Clinical Assessment of Pain form generated by Dr. Katoch.

## 5.    Medical-Vocational Rule 201.18

Claimant next asserts that she should have been found disabled pursuant to Medical-Vocational Rule 201.18.  However, satisfaction of Rule 201.18 results in a

---

[33] Tr. 27, 32.

[34] Tr. 28 (alteration supplied).

[35] Tr. 27.

[36] Tr. 22-23.

finding of "not disabled." *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2, Rule 201.18. Accordingly, this argument is meritless.

## 6.     Reopening Previous Decision

Claimant next asserts that the Commissioner erred in refusing to "reopen" the ALJ's October 4, 2010 decision on the previous application for benefits she filed on April 15, 2008.  Generally, if a claimant is not satisfied with the Commissioner's administrative decision, but she does not request review of that decision within the time allowed, the claimant loses her right to further review, and the administrative decision becomes final.  20 C.F.R. §§ 404.987(a), 416.1487(a).  However, even a final administrative decision can be reopened under certain circumstances. *Id.* Within twelve months of the notice of the initial decision, it can be reopened for any reason. 20 C.F.R. §§ 404.988(a), 416.1488(a).  A decision can be reopened for "good cause" within four years in the case of Title II benefits, and within two years in the case of Title XVI benefits.  20 C.F.R. §§ 404.988(b), 416.1488(b).  "Good cause" exists if: "(1) New and material evidence is furnished; (2) A clerical error in the computation or recomputation of benefits was made; or (3) The evidence that was considered in making the determination or decision clearly shows on its face that an error was made." 20 C.F.R. §§ 404.989(a), 416.1489(a).

Because claimant's request to reopen was made more than twelve months after

the October 4, 2010 administrative decision, it could be granted only if she demonstrated "good cause."  According to claimant, the decision should have been reopened because her school records, which showed an IQ score of 68 and were submitted on October 23, 2012, constituted new and material evidence that should have changed the administrative outcome on the previous application.

The ALJ considered claimant's request to reopen the previous decision, but he concluded that there was no good cause, and no other basis, to support claimant's request.[37]  The ALJ did not explain that conclusion, but the court nonetheless agrees with it.

It is not clear which standard for evaluating "new and material evidence" should apply in this situation.  If it is the standard cited above for evidence submitted for the first time to the Appeals Council, the court must consider the entire record, including the new evidence, to determine whether the ALJ's decision to deny benefits was erroneous.  Here, even though the ALJ did not officially "reopen" claimant's past application, he did consider the "new and material" evidence upon which claimant relies: *i.e.,* her school records and IQ score of 68.  As discussed above, even assuming claimant does have a valid full-scale IQ score of 68, she still should not be considered disabled under the Listing for intellectual disability, because she did not demonstrate sufficient adaptive limitations.

---

[37] Tr. 19-20.

The other possible standard is the one governing a "Sentence Six" remand, which is applicable "when the claimant submits evidence for the first time to the district court that might have changed the outcome of the administrative proceeding." *Timmons v. Commissioner of Social Security*, 522 F. App'x 897, 902 (11th Cir. 2013).[38]  In such a case,

> the claimant must show the evidence is new and material and was not incorporated into the administrative record for good cause. [*Ingram*, 496 F.3d at 1267.]  New evidence is material, and thus warrants a remand, if "there is a reasonable possibility that the new evidence would change the administrative outcome." *Hyde v. Bowen*, 823 F.2d 456, 459 (11th Cir.1987).

*Timmons,* 522 F. App'x at 902-03.  Here, claimant provided no reason — much less "good cause" — why her school records, which clearly were in existence prior to the hearing on her April 15, 2008 application, were not provided during the administrative proceedings.  Moreover, for the reasons discussed in the previous

---

[38] A "sentence six" remand refers to the sixth sentence of 42 U.S.C. § 405(g), which states:

The court may, on motion of the Commissioner of Social Security made for good cause shown before the Commissioner files the Commissioner's answer, remand the case to the Commissioner of Social Security for further action by the Commissioner of Social Security, and it may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding; and the Commissioner of Social Security shall, after the case is remanded, and after hearing such additional evidence if so ordered, modify or affirm the Commissioner's findings of fact or the Commissioner's decision, or both, and shall file with the court any such additional and modified findings of fact and decision, and, in any case in which the Commissioner has not made a decision fully favorable to the individual, a transcript of the additional record and testimony upon which the Commissioner's action in modifying or affirming was based.

paragraph, there is not a reasonable possibility that claimant's school records would have changed the administrative outcome.

In summary, regardless of which standard the court employs for evaluating "new and material evidence," the ALJ did not err in rejecting claimant's request to reopen her prior application for benefits.

## 7.    Conclusion and Order

Based on the foregoing, the Commissioner's finding that claimant is not disabled was supported by substantial evidence and in accordance with applicable law.  Accordingly, the decision of the Commissioner is AFFIRMED.  Costs are taxed against claimant.  The Clerk of Court is directed to close this file.

DONE this 10th day of February, 2015.

_____
United States District Judge